Estate of Cortlandt Parker, Charles W. Parker and Robert M. Parker, Surviving Trustees, and Charles W. Parker, Surviving Executor of the Last Will and Testament of Cortlandt Parker, deceased v. Commissioner.
Estate of Parker v. Commissioner
Docket No. 110664.
United States Tax Court
1943 Tax Ct. Memo LEXIS 120; 2 T.C.M. (CCH) 763; T.C.M. (RIA) 43415; September 10, 1943
*120 John M. Emery, Esq., 744 Broad St., Newark, N.J., for the petitioners. Robert S. Garnett, Esq., for the respondent. SMITH Memorandum Opinion SMITH, Judge: This proceeding involves income tax deficiencies for 1937, 1938, and 1939 in the respective amounts of $6,637.68, $8,036.96, and $7,990.30. The deficiencies result from respondent's determination that petitioner is an association taxable as a corporation. [The Facts] Petitioner was created in 1909 under a trust agreement entered into by the following named eight children and grandson of Elizabeth W. Parker and Cortlandt Parker, both previously deceased: Katharine M. Beckman, Richard Wayne Parker, James Parker, Mary F. Parkman, Cortlandt Parker, Jr., Charles Wolcott Parker, Chauncey Goodrich Parker, Robert Meade Parker, and Malcolm Campbell (grandson). Elizabeth W. Parker died intestate January 1, 1907, leaving a small estate consisting principally of her personal effects and a house and lot in Perth Amboy, New Jersey. Cortlandt Parker, Sr., hereinafter sometimes referred to as the decedent, died testate July 29, 1907. He left a large estate consisting of numerous parcels of real estate, both improved and unimproved, situated *121 in Newark, Perth Amboy, and other places, principally in the State of New Jersey, and a considerable amount of stocks and bonds and other personal property. The above named children and grandson were the only heirs at law of Elizabeth W. Parker and were the principal legatees under decedent's will. In his will decedent left to each of his eight surviving children and his grandchild, Malcolm Campbell, a one-ninth part of his entire estate subject, however, to the payment of his debts and a number of specific legacies. He named as executors of his will his three eldest sons, Richard Wayne Parker, Cortlandt Parker, Jr., and Charles W. Parker. Any vacancies in the executorship were to be filled by his other sons in the order of seniority. The executors were given authority to sell any of the real property of the estate, wherever situated, in their own discretion as to time, price, and terms. The trust agreement referred to above under which petitioner was created was executed on November 18, 1909, more than two years after decedent's death. Up to that time there had been no partition or final distribution of decedent's estate among the residuary heirs. The heirs felt that it would *122 be to their mutual advantage to continue to hold and manage the assets of the estate as an entity and to receive regular distributions of the income therefrom. The trust agreement provided in part as follows: And Whereas, by deeds of even date herewith the said party of the First Part have granted, bargained, sold and conveyed unto the party of the Second Part, as joint tenants and not as tenants in common, and to the survivors or survivor of them, and their and his heirs and assigns, all the estate and property, real and personal, which were of the said Cortlandt Parker and Elisabeth Wolcott Parker, deceased, which remain undistributed, and all the estate, legal and equitable, residuary interest and distributive shares of the party of the First Part and each of them therein, to have and to hold the same unto the party of the Second Part. as joint tenants and not as tenants in common, and to the survivors or survivor of them, their and his heirs and assigns, to their and his use forever, and the party of the First Part have thereby respectively released and discharged the party of the Second Part as executors of Cortlandt Parker of and from all the several distributive shares of the *123 party of the First Part under the Will of the said Cortlandt Parker, and in the estate of Elisabeth W. Parker, and of and from all obligation to file an inventory thereof, or to render accounts thereof in the Orphans' Court of Essex County as such executors. Now Therefore This Indenture Witnesseth, that said conveyance is made in trust nevertheless that the party of the Second Part, hereafter denominated the Trustees, shall hold, control, lease, mortgage, or sell and convey, all or any part of said premises, or any property acquired by them, and shall have and use full discretion as to how long the same shall be kept unsold, especially as to the homestead and any other property in Newark and Perth Amboy, which in their opinion is or is likely to be available for business or commercial purposes, or may properly be kept for improvement in value for the benefit of the said estate in the discretion of said Trustees; and the Trustees are hereby empowered to repair, alter or build upon any part of said estates, to let the same upon building leases, or long leases, or on ground rent; to purchase riparian rights, to hire office room, employ and pay attorneys, counsel or other agents; to *124 pay taxes, interest or other charges upon said lands; to perform and settle any trusts connected with any portion thereof, to settle, manage, continue or dispose of any corporate interests of said testator in corporations, to advance money so far as they deem prudent to maintain such interests or said estates, and generally to deal with said property as fully as the said Cortlandt Parker or Elisabeth W. Parker, deceased, could have done if they were living; and the said Trustees are hereby empowered to allow the homestead in Newark to be occupied by members of the family with or without rent, furnished or otherwise, as they may think advisable to preserve the same until it should be useful for other purposes. The Trustees shall keep careful accounts of all said property and its proceeds, rents, issues and profits, which accounts shall be always open to any of the beneficiaries or their heirs or assigns, and shall annually distribute the net income of all said property, taken as a whole, in equal shares to and among said beneficiaries, their heirs or assigns, and the Trustees may in their, discretion distribute principal thereof in like manner, or may invest or re-invest the same as *125 part of the trust. Such investments may be made not only in investments recognized as proper for trustees by the laws of the State of New Jersey, or in loans at interest to any person beneficially interested on the security of such interest, but also in the purchase of land adjoining any of the lands held or to be held by the Trustees, or in improved business property in the heart of Newark or Perth Amboy, or in such substantial buildings upon any part of the real property in their hands as may seem to them in their discretion likely to be promptly repaid by income. In case of a vacancy in the number of Trustees the same shall be filled by the other Trustees or Trustee as long as may be from the sons of said Cortlandt Parker, deceased, in order of age. willing to accept the duties thereof, or otherwise by some other person chosen by the remaining Trustees or Trustee; and the owners of more than half of the beneficial interest may by deed duly acknowledged request the addition or removal of Trustees named by them; and the acting Trustee or Trustees thereupon shall convey all said property to have and to hold the same to the use of the Trustees remaining or so chosen or named in like *126 joint tenancy in fee-simple who shall then be Trustees by the same trusts and with the same powers herein mentioned. And this indenture further witnesseth that. with the written assent of the persons holding a two-thirds beneficial interest, the Trustees may in their discretion convey all or any of said property to a land holding stock corporation to be formed under the laws of the State of New Jersey, so that the stock shall be distributed among the persons beneficially interested in such trust, and that the affairs of the corporation shall be managed by three directors, for the benefit of the stockholders and free of said trusts. And it is further agreed that in case of a difference of opinion among the Trustees, a majority shall decide. And it is further agreed that the Trustees may charge commissions at the rate of three per centum on principal and five per centum on income actually paid over, but not on investments and re-investments, and shall also receive their reasonable expenses as aforesaid and legal reasonable charges for purely legal work done by them as attorneys or counsel. And it is further witnessed and agreed as follows: The title to the above mentioned real *127 estate and to all property of which the trust fund may at any time consist is vested and to be vested exclusively in the Trustees acting under the terms of this instrument, so that the beneficiaries, their heirs and assigns are and shall be without interest therein other than that conferred by the terms of this instrument, and shall have no right to call for any partition, accounting or division of property, profits, rights or interests, except of the net income as hereinbefore provided. If any Trustee resign his office he shall convey all his estate to the remaining Trustees, by deed duly acknowledged, and in the event of a vacancy in the number of Trustees the surviving or remaining Trustees or Trustee shall have and exercise all the powers by this instrument conferred upon the Trustees herein named, until the appointment of a successor or successors as above provided. The trust was to continue until the death of the last survivor of the beneficiaries, or it could be sooner terminated by the owners of two-thirds of the beneficial interests. The remaining assets, or proceeds from the sale thereof, were then to be divided among the beneficiaries or their heirs or assigns in proportion *128 to their respective interests. The trustees were given the specific power to "straighten any boundaries"; borrow money "for temporary exigencies" but to the extent of $25,000 only; mortgage the trust property to the extent of $100,000 for the purpose only of "paying off existing encumbrances on the property conveyed to them, for making improvements in the property, or to pay assessments or other liens now or hereafter attaching to the property by the action of any public authorities"; determine the amount of the net income received from the property and declare therefrom "such dividends as in their opinion may be judicious, having in view the necessity of eventually paying any mortgages or other liens on the property, or of saving income for improvements." It was further provided that upon the death of any beneficiary or assignee thereof his or her beneficial interest, if not disposed of by will, should pass as real estate to his or her heirs and that "no assignment of a beneficial interest shall be recognized as valid by the Trustees unless the same be made by deed duly executed and acknowledged, nor shall the Trustees be bound to recognize any such assignment until written notice *129 be given them thereof." The trustees or successor trustees have continued to hold and manage the bulk of the assets of decedent's estate up to the present time. No final account has ever been filed with the probate court by the executors and there has been no final distribution in settlement of the estate. One of the trustees under the trust agreement, and executor under decedent's will, Cortlandt Parker, Jr., died in 1917 and was succeeded by Chauncey G. Parker. Another of the trustees and executors, Richard Wayne Parker, died in 1923 and was succeeded by General James Parker, who died in 1934 and was succeeded by Robert M. Parker. From that time and during the taxable years 1937, 1938, and 1939 the trustees were Charles W. Parker, Chauncey G. Parker, and Robert M. Parker. Among the more valuable real estate holdings of the trust were several business properties located in Newark. One of these properties, at the corner of Broad and Cedar Streets, had been owned by the decedent and his son Richard Wayne Parker as tenants in common. When the half interest of the decedent's estate was conveyed to the trust in 1909 the property was under a lease to McCrory Stores which was to run *130 until 1932 at a graduated rental of from $25,000 to $30,000 a year. The lease was renewed by the trustees and the executrix of the estate of Richard Wayne Parker, deceased, in 1925 for a period of 70 years at a graduated rental of from $37,500 to $60,000. The new lease covered an adjacent lot which previously had been purchased by the trustees and Richard Wayne Parker. Another of the trust properties, located at 721 Broad Street, was leased to the Kresge Foundation by the trustees in 1912 for a term of 50 years at a rental of $16,000 a year. A new building was erected on the premises by the lessee pursuant to an amendment made to the lease in 1925 and in 1932 the lease was further amended to call for a graduated rental of from $21,000 to $27,000 a year. From time to time the trustees sold off parcels of real estate which they did not consider desirable for investment or for income-producing purposes. They never bought and sold real estate as a business enterprise. They never sold or offered for sale any of the more productive properties of the trust estate, such as the two referred to above. They never undertook to subdivide or develop any of the unimproved properties. The few purchases *131 of real estate which they made were for the purpose of improving or protecting the properties which the trust already owned. The decedent's holdings in stocks and bonds were not extensive. There were twenty different blocks of stock among the properties which were conveyed to the trust upon its inception, consisting mostly of small lots of from 5 to 160 shares each. There were five different lots of bonds, two of which appeared to have been worthless when acquired by the trust. The other bonds were all sold or surrendered, some before and some after 1939, for about $12,000. There were eleven real estate mortgages ranging in amounts from about $1,000 to $17,000. The only other asset of the decedent's estate of any substantial value to be acquired by the trust was an interest in a claim involving a patent infringement suit which decedent had handled for the claimant. In settlement of the claim the trustees received in 1914 a cash payment of $526,598.99 and 749 shares of common stock of Ansco Photo Products Co. The trustees distributed $450,000 of the amount so received to the beneficiaries in 1914. During its existence petitioner has acquired only a comparatively small amount of stocks, *132 principally by the exercise of stock rights. Most of the investments of trust funds have been in municipal, government, and railroad bonds and real estate mortgages. The trustees have always followed a policy of making legal trust investments. Petitioner has never engaged in trading in securities as a business. Pursuant to the provisions of the trust agreement petitioner has made loans to the beneficiaries from time to time amounting in the aggregate to nearly $200,000. These loans up to 1940 had all been repaid with interest, except for two or three that were then outstanding. Petitioner has never made any loans to others than direct beneficiaries, except in a few minor instances, and has never conducted a loan business. Petitioner's net income has amounted to from $45,000 to $55,000 a year for each of the years 1932 to 1939, inclusive. The trustees have always treated this income as currently distributable and have so reported it in fiduciary income tax returns. Distributions of income to the beneficiaries have been made usually on a monthly basis. Not all of the income has been distributed annually, the amount of the distributions depending upon the need of the trustees for funds. *133 Petitioner has never made a practice of accumulating income for capital purposes. Petitioner has always conducted its business in an informal manner. No regular or formal meetings of the trustees or beneficiaries have ever been held. Adequate records have been kept by the trustees at all times and regular reports have been made to the beneficiaries. No certificates of stock or evidence of beneficial interests in petitioner have ever been issued. There has never been any assignment or transfer of a beneficial interest except in case of death of a beneficiary. [Opinion] Petitioner's contentions are that it is a pure trust and not an association taxable as a corporation. (Section 3797 (a) (3) I.R.C.; section 1001 (a) (2), Revenue Act of 1936; section 901 (a) (2), Revenue Act of 1938.) The evidence may be said to show, in its most favorable light to petiioner's contentions, that the petitioner was created for the purpose of conserving the assets of decedent's estate and in keeping them intact for the purpose of producing a regular income for the beneficiaries. Petitioner's only witness, Charles W. Parker, a justice of the New Jersey Supreme Court, testified in this proceeding *134 as follows: Q. Would you please tell us, Judge Parker, what the circumstances were that led up to this joint tenancy and trust agreement of November 18, 1909? A. As I understand the matter there was this great amount of real estate; there was some personal property also, but especially the real estate, and in the usual administration of the estate it would have been necessary to go through the form of settling up the estate, carrying out the provisions of the will, dividing up the properties, I suppose, among the various persons interested in the estate. It might have meant a lot of partition suits. It would have created a great deal of difficulty. Most of the properties many of the properties, were well rented and the general concensus of opinion among the beneficiaries was that it would be possible to leave them as they were and not subject them to being possibly frittered away by parties to whom they had been assigned in severancy, to keep them all together and to utilize them as a basis for a very substantial and steady income. That was the underlying thought. The provisions of the trust agreement do not show a purpose inconsistent with that described by the witness, although *135 they do confer upon the trustees broad powers which would have permitted them to engage in several different types of business enterprises. The Supreme Court said in Morrissey v. Commissioner, 296 U.S. 344, that the purpose of the trust must be determined from the provisions of the trust agreement. On the evidence of record we can not say that management of the large rental properties and the investment of the funds of the estate did not constitute "a medium for the conduct of a business and sharing its gains." Morrissey v. Commissioner, supra. Neither can we say that the conduct of that business and the sharing of the income was merely incidental to the purpose of the trust to conserve the assets of the estate. The question here is controlled, we think, by the cases of Morrissey v. Commissioner, supra;Swanson v. Commissioner, 296 U.S. 362; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369; Marshall's Heirs v. Commissioner (C.C.A., 3rd Cir.), 111 Fed. (2d) 935, *136 reversing in part 39 B.T.A. 101; Sears v. Hassett (C.C.A., 1st Cir.), 111 Fed. (2d) 961, and other cases of like import. Under the rule of those cases the fact that petitioner may have been organized principally for the purpose of conserving the assets of decedent's estate would not necessarily relieve it from tax liability as an association. Such a trust might still have all the essential characteristics of an association as defined by the courts. The facts here are not materially different from those in Marshall's Heirs v. Commissioner, supra. The court said in that case: Many of the indicia of the business trust as referred to by the Supreme Court in the Morissey case, 296 U.S. at page 359, 56 S. Ct. 289, 80 L. Ed. 263, are present. The trustee holds the title to the property "embarked" in the enterprise. The trustee as a continuing trustee affords uninterrupted management of the property. Management is centralized in the trust and continuity remains uninterrupted except by the death of the last surviving beneficiary or the termination *137 of the lease. The transfer of beneficial interest to minor children of the beneficiaries is contemplated. The liability of the trustee is limited expressly to the property in its hands. * * * * *
The trustee possesses the broad powers necessary to carry on a business for profit. For example, with the consent of a majority in interest of the beneficiaries it may borrow money to construct a building upon the premises and sell at public or private sale the whole or any part of the real estate. It is our opinion that these powers transcend those of a trustee under a traditional trust. The broad powers conferred upon the trustee by the indenture were not exercised, but we think this to be immaterial. Such powers may be exercised by the trustee if necessary. We conclude that the trust is a business trust and the trustee is engaged on behalf of the beneficiaries in the handling of their real estate for profit. * * * In Sears v. Hassett, supra, the heirs of an estate established a trust, similar to the petitioner, to simplify the holding of legal title to and facilitate disposition of the different parcels of real estate but not to engage in real estate *138 operations as a business. After quoting from the opinion of the Supreme Court in Helvering v. Coleman-Gilbert Associates, supra, the court said: That the language in the foregoing quotation closely fits the F. R. Sears Real Estate Trust is apparent from a glance at the trust instrument. The trustees have wide powers to buy and sell real estate; to improve and develop the same by the erection of buildings, or otherwise; to repair or rebuild any building damaged by fire or otherwise; to lease; to employ such agents and assistants as deemed necessary; to invest and reinvest funds "in any securities they see fit"; to pay from the net income of the trust property "such dividends to the beneficiaries as they may from time to time deem expedient". In quest of profits the trustees are in effect empowered to engage in extensive real estate operations and in the business of investing and reinvesting in securities. Even if at any time all of the real estate may have been disposed of, the termination of the trust is at the absolute discretion of the trustees. In the language of the Morrissey case, 296 U.S. at page 357, 56 S. Ct. at page 295, 80 L. Ed. 263, *139 this trust provides "a medium for the conduct of a business and sharing its gains." As was said in the Coleman-Gilbert case, supra, "the parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." It can not be claimed, and no such contention is made, that petitioner was a liquidating trust. Its avowed purpose was to hold the properties of the estate for income production. Cf. Blair v. Wilson Syndicate Trust, 39 Fed. (2d) 43. Following the rule of the cited cases we must sustain the respondent in this determination that petitioner, during the taxable years 1937, 1938, and 1939, was an association taxable as a corporation. Decision will be entered for the respondent.