St. Louis Hills Syndicate Fund et al., Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Wellston Hills Syndicate Fund et al., Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Webster Hills Syndicate Fund et al., Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Kingshighway Hills Syndicate Fund et al., Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 80258, 80259, 80260, 80261.   Promulgated September 28, 1937.

*George M. Raissieur, Esq.,* and *W. A. Helm, C. P. A.,* for the petitioners.

*B. H. Neblett, Esq., H. P. Noneman, Esq.,* and *J. F. Gregory, Esq.,* for the respondent.

576

## OPINION.

ARNOLD : The principal issue in each of these proceedings is whether the syndicates are associations taxable as corporations. In discussing this issue it should be noted that the terms of the syndicate agreements are so nearly identical that a principle applicable to one is applicable to all. Likewise, we direct attention to the fact that the method of creating and operating each syndicate was so much alike that any principle applicable to one is applicable to all.

In addition we have certain factors in these proceedings which are undisputed, or are so clearly established as to be indisputable. We are satisfied that, whatever designation may be given to the enterprises, there can be no doubt that each was essentially a business undertaking. Each subscriber put in capital with the expectation and hope of realizing a profit. Their subscriptions were pooled and

the fund used to purchase unimproved property, previously acquired by Cyrus Crane Willmore or by his wholly owned corporation, the Willmore Organization. Their subscriptions were further used to improve and subdivide the property purchased, and to pay the taxes thereon. The agreements, the testimony, and the other evidence of record indicate that the undertaking was one for mutual benefit and profit to all. The business of each enterprise was the subdivision and sale of tracts of land. There was no thought or even suggestion that liquidation of any sort was involved. Since the entire record points to the business nature of the enterprise, and since there obviously was a pooling of capital by the various subscribers who were participating, the question naturally arises whether the syndicates were not, from an income tax standpoint, associations taxable as corporations.

Petitioners contend that these subdivision projects were actually Cyrus Crane Willmore's, because he owned the Willmore Organization 100 percent, and it in turn owned the realty companies 100 percent. It is their contention that Willmore acquired the properties, but needed capital for their development and improvement. The syndicate agreements, they say, were financial vehicles which Willmore used to raise additional capital without being obligated to repay at any definite time and without any obligation to repay if the subdivision was a failure. Willmore was able to sell the idea because of his own ability and personality and because of the opportunity to share in the profits if his subdivisions proved successful. According to the petitioners, the subscriptions were loans or advances in the nature of loans.

The Willmore Organization was the syndicate manager as to each syndicate, issued checks against the syndicate fund, and determined the improvements necessary, the prices and terms of sale, and otherwise operated under the provisions of each agreement. The other operating party under the agreement was the realty company holding title to the property. It contracted for improvements, receipted for money, executed deeds of trust and purchase agreements for lots, conveyed the land sold, etc. Both the syndicate manager and the titleholder of the property were Missouri corporations. It was by virtue of the activity of these two subscribers that the syndicate members secured centralized management and conduct of the business. The subscriber, by executing the agreement, specifically delegated to these two corporations the responsibilities of operating and managing the enterprise for the common benefit of all.

The realty companies, holding title to the separate tracts, were authorized, by virtue of the corporate powers stated in their charters, to hold title to and engage in the real estate business. Since

the fund subscribed was to be, and was in fact, first applied to the purchase of the unimproved property, and since title thereto was held in the name of one of the subscribers, it seems idle to contend that no subscriber, other than the titleholder, had any interest whatsoever in the property purchased. It seems to us that each subscriber had a proportionate interest in the assets of the undertaking even though title was taken in the name of another. Cf. *Central Republic Bank & Trust Co., Trustee*, 34 B. T. A. 391.

Each syndicate agreement provided expressly for the transferring of the subscriber's rights thereunder, and some of the agreements show that there were either transfers or reductions in members' interests during the existence of the syndicate. It does not appear that the death of any subscriber would terminate or interrupt the continuity of the enterprise one way or the other. In these respects each enterprise secured the continuity of existence, without interruption by death or transfer of interest, which is peculiar to corporate organizations.

One other factor pointing to the ultimate answer is the express prohibition contained in each agreement against the unlimited liability that partners have in connection with their business. Each syndicate agreement contains an express disclaimer as to any partnership liability between subscribers, or between a subscriber and the realty company holding the land. Each subscriber's personal liability was further limited by the guaranty of the realty company that his loss, if any, should not exceed the amount of his subscription. In this respect each subscriber secured a limitation of personal liability exactly like the liability of a corporate stockholder.

Recent decisions of the Supreme Court have set forth the distinguishing features of a trust which may be regarded as making it analogous to a corporate organization, where the trust is created and maintained as a medium for the carrying on of a business enterprise and sharing in its gains, *Morrissey* v. *Commissioner*, 296 U. S. 344, and related cases in 296 U. S. at pages 362, 365, and 369. It is true that we do not have a trust here, but we do have "associates", and we do have resemblance to a corporate organization. In addition to considering trusts as associations, the Supreme Court in the *Morrissey* decision discussed associations as corporations, saying:

The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity. The resemblance points to features distinguishing associations from partnerships as well as from ordinary trusts. As we have seen, the classification cannot be said to require organization under a statute, or with statutory privileges. The term embraces associations as they may exist at common law. *Hecht* v. *Malley, supra.* We have already referred to the definitions, quoted in that case, showing the ordinary meaning of the term as applicable to a body of persons united without a charter "but upon the

methods and forms used by incorporated bodies for the prosecution of some common enterprise." These definitions, while helpful, are not to be pressed so far as to make mere formal procedure a controlling test. The provision itself negatives such a construction. Thus unincorporated joint-stock companies have generally been regarded as bearing the closest resemblance to corporations. But, in the revenue acts, associations are mentioned separately and are not to be treated as limited to "joint-stock companies," although belonging to the same group. While the use of corporate forms may furnish persuasive evidence of the existence of an association, the absence of particular forms, or of the usual terminology of corporations, cannot be regarded as decisive. [P. 357.]

In *Swanson* v. *Commissioner*, 296 U. S. 362, 365, the Court pointed out that the limited number of actual beneficiaries did not alter the *nature and purpose* of the common undertaking. Nor did the limitation of their operations to the property first acquired change the *quality* of that undertaking.

Again in *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369, 373, the Supreme Court points out that mere differences of formal procedure should not be unduly emphasized. It is stated:

* * * If such differences were to be made the test in determining whether or not an enterprise for the transaction of business constitutes an association, the subject would be enveloped in a cloud of uncertainty, and enterprises of *the same essential character* would be placed in different categories simply by reason of formal variations in mere procedural details. The significant resemblance to the action of directors does not lie in the formalities of meetings or records but in the fact that, by virtue of the agreement for the conduct of the business of a joint enterprise, the parties have secured the centralized management of their undertaking through designated representatives. [Emphasis supplied.]

And so it is here. These subscribers formed an organization to conduct the business of holding, improving and selling real estate, with provision for the management of the undertaking through designated representatives (two Missouri corporations), *Bing & Bing, Inc.*, 35 B. T. A. 1170, with continuity undisturbed by death or changes in ownership, and with limited liability. The subscribers were associated in a joint enterprise for the transaction of business and the making of profits. In our opinion, therefore, each of the foregoing syndicates was an association taxable as corporations are taxed. Cf. *Thrash Lease Trust,* 36 B. T. A. 444.

Our decision on the taxable status of the syndicates disposes of the question raised in two of the proceedings, Saint Louis and Wellston, that distributions made by them represented interest paid. These distributions can not be treated as interest payments, and respondent's action in disallowing deductions claimed therefor is approved.

*Decision will be entered for the respondent.*